## Case No. 5,352.

### GEORGIA v. O'GRADY.

[3 Woods, 496;[1] 5 Cent. Law J. 465; 24 Int. Rev. Rec. 5.]

Circuit Court, N. D. Georgia. Sept. Term, 1876.

REMOVAL OF CAUSES — CRIMINAL CASES — COMMENCEMENT OF PROSECUTION — RIGHT TO CHALLENGE JURORS—TRIAL OF INDICTMENT FOR MURDER — SOLDIER ACTING AS PART OF MARSHAL'S POSSE.

1. Under section 643 of the Revised Statutes, providing for the removal of criminal cases from a state to a federal court, the prosecution is not commenced until the finding of an indictment.

[Cited in State v. Port, 3 Fed. 117; State v. Bolton, 11 Fed. 218.]

2. Upon the trial of a case, removed under said section, the right of the parties to challenge jurors is regulated by the law of the United States.

3. Upon the trial of an indictment for murder, removed to the federal court, under said section, the accused is called to answer to the offense as defined by the laws of the state.

4. A United States soldier, when acting as a part of the posse of a United States marshal or revenue officer, is as much bound to obey the laws of the United States as any other citizen, and he has the same rights of self-defense, and no other.

Trial of an indictment for murder.

In January, 1876, three United States soldiers, belonging to the garrison in Atlanta, Ga., were arrested in Gilmer county, Ga., under state process, for the alleged murder

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

of one John Emory, a citizen of that county. After examination by the magistrates, they were committed to prison to await trial. They then petitioned the circuit court of the United States, for the Northern district of Georgia, the district which includes Gilmer county, for the removal of the cause into that court by the writ of habeas corpus cum causa, under the provisions of section 643 of the Revised Statutes of the United States, alleging that the prosecution was for acts done by them while acting under a revenue officer of the United States, and on account of a right claimed by them under the revenue laws. The court not being in session, the petition was presented to the clerk, who issued the writ. This was served, and the marshal took the prisoners into custody and took them before the United States district judge. On motion of the attorney general of Georgia, Judge ERSKINE, after argument, directed the marshal to return the prisoners to the state officers, holding that the prosecution was not commenced, in the meaning of that section of the Revised Statutes, until the finding of an indictment. At the next term of the superior court of Gilmer county, in May, 1876, an indictment was found against the three prisoners for the crime of murder, charging one of them, O'Grady, as principal in the first degree, and the two others, Wells and Newman, as principals in the second degree, as accessories before the fact and as accessories after the fact. The prisoners then petitioned anew for the removal of the cause into the United States circuit court, and for the writ of habeas corpus cum' causa. The circuit court was not in session, and therefore the petition was presented to its clerk and filed in his office. He issued the writ, and it was promptly served on the clerk of Gilmer superior court by the marshal. The prisoners then moved that court for two orders—one directing the clerk to certify and send the record to the circuit court; the other, that the sheriff should deliver the prisoners to the United States marshal. The court, after careful examination of the writ, became satisfied that it conformed to the act of congress, and granted the orders. The marshal took the prisoners to Atlanta, and applied for the direction of Judge ERSKINE, who ordered that they should be held in prison, by the marshal, for trial at the next term of the circuit court, but permitted Wells and Newman to be released, if they should tender sufficient bail, in an amount fixed by him, a state judge having previously pronounced their offense to be bailable.

At the next term of the circuit court, WOODS, Circuit Judge, and ERSKINE, District Judge, sitting, the prisoners were arraigned and pleaded not guilty, and claiming the right to be tried separately, O'Grady was put on trial. The question arose, whether the parties should respectively have the number of challenges of jurors allowed by the law of Georgia, or the number allowed in cases of the same class by the law of the United States. The court decided that in this matter the law of the United States was applicable, and, accordingly, allowed the prosecution five peremptory challenges, and to the defense twenty, as provided in section 819 of the Revised Statutes.

The evidence showed that the three soldiers belonged to a detachment that had been sent from the garrison in Atlanta, to aid the deputy collector of internal revenue, and the deputy marshal of the United States, in executing the law in the mountain regions of Georgia. That country is distant from markets for its farm products, and therefore presents temptations to the conversion of corn into so portable a form as whisky, and abounds in obscure recesses where small distilleries can be run without much danger of general observation. The inhabitants have long been accustomed to make whisky without license or tax. The revenue law is odious to them, and they have the reputation of being ready to do violence in resisting the enforcement of it. The three soldiers were detailed from the camp by the lieutenant commanding, to go with the deputy collector and deputy marshal on a nocturnal expedition to a neighborhood in which illicit distilleries were reported to be carried on. When they were leaving the camp their commander told them to beware of surprise. On the way they were informed by citizens that the neighborhood was dangerous, and that their party was too small. After midnight, they found an illicit distillery in operation on the premises of Emory, the deceased; took possession of it, and arrested four persons whom they found inside. Wells, who was a sergeant, went off in search of a wagon belonging to the party, leaving Newman and O'Grady to guard the prisoners and the distillery, having placed Newman inside, with the four prisoners, and O'Grady outside, as a sentinel, with a caution to O'Grady to challenge all comers, and to be on the alert against surprises. Soon after he left, the prisoners made some movement which Newman took as hostile, and he threatened them in rather rough language, audible to O'Grady. Emory, the proprietor, knew nothing of all this, but was sleeping in his house a few rods distant, when a friend came, waked him, and gave him information that the revenue officers were in the neighborhood. Not suspecting that they were so near, he ran from the house toward the distillery, shouting to his friends there to escape. About the time that he would have reached the distillery, O'Grady fired his musket, and nothing more was seen of Emory that night by any witness. There was a conflict of testimony on the point, whether O'Grady challenged before firing, Newman testifying that he heard the challenge, and the prisoners in the still-house testifying that they did not hear it. Wells

and others of the revenue party soon came with the wagon, and they all left the premises, carrying away the prisoners and the still. The next morning Emory was found dead in a small water-course near the distillery, with a fatal bullet wound in his head, and blood was traced from a spot near the distillery to the brink of the stream.

N. J. Hammond, Atty. Gen. of Georgia, for the prosecution.

A. T. Ackerman, H. P. Farrow, U. S. Atty., and George S. Thomas, Asst. U. S. Atty., for the defense.

Before WOODS, Circuit Judge, and ERSKINE, District Judge.

WOODS, Circuit Judge (charging jury). Though this case is tried in a court of the United States, it is to be determined by the law of Georgia, and you are to decide whether, under the law, O'Grady is guilty or not of the crime of murder, with which the indictment charges him. Murder is defined by the Code of Georgia as "the unlawful killing of a human being, in the peace of the state, by a person of sound memory and discretion, with malice aforethought, either express or implied." Attention has been called in the argument of counsel to another species of homicide —manslaughter, which is defined in the same Code as "the unlawful killing of a human creature, without malice, either express or implied, and without any mixture of deliberation whatever," etc. We are of the opinion that if the facts in proof in this case show any crime, it is murder, and not manslaughter, and therefore you may dismiss the question of manslaughter from your consideration.

The defendant comes to this bar, like every other person charged with crime, presumed to be innocent until his guilt is proved, and the proof is insufficient for conviction unless it excludes all reasonable doubt. It is conceded that the deceased was killed by the prisoner. This fact, without explanation, would make out a case of murder, and if no explanation were offered, it would be your duty to return a verdict of guilty. But the fact of the homicide is open to explanation. The defense undertakes the explanation, and justifies the killing on the ground of self-defense. It insists that O'Grady, situated as he was at the time, had reasonable cause to believe, and did believe, that deceased was approaching him with a hostile and felonious intent, and that, in consequence thereof, he stood in peril of his life, or of great bodily harm. If the evidence satisfies you that this view is correct, you should acquit the prisoner. To form a right judgment upon this defense, you should put yourselves in his place at the time, and look at the facts, not as they appear by the light of subsequent disclosures, but as they then appeared to him.

His counsel relies on facts which he insists are proved, that the neighborhood had a reputation for violence towards those in the revenue service; that there was a supposed necessity of protecting and aiding them with military force; that it was night; that the prisoner was unacquainted with the ground; that his officers had warned him to be watchful against surprise; that the sergeant had ordered him to challenge every one who might come near; that he and his comrade were guarding four prisoners, who, if reinforced, might easily overpower them, and who had manifested a hostile disposition; and that deceased came running and shouting in a manner that might well be taken for a bold assault, and did not halt when challenged, and argues that there was enough to excite the fears of a reasonable man, and to justify him in repelling the apprehended violence with a shot. You will consider all these facts, so far as they have been proved, and allow them due weight in support of the defense. The Code of Georgia justifies a homicide committed in defense of one's person "against one who manifestly intends, or endeavors, by violence or surprise, to commit a felony on the person"; but it also declares that a bare fear of such an offense shall not justify the killing. "It must appear that the circumstances were sufficient to excite the fears of a reasonable man, and that the party killing really acted under the influence of those fears."

The defendant derives no protection from the fact that he was a soldier. It was a time of peace, and a soldier was as much bound as a citizen to respect the laws of the state. He was there as a part of the posse of the revenue officer and of the marshal, and had the same, and only the same, rights of self-defense that a citizen would have had under the same circumstances. Even if he had been ordered by his military commander to fire the fatal shot, that order, unless in itself lawful, would be no protection to him, for a soldier has no right to obey an unlawful order.

Nor can the accused derive any protection from the fact, if it be a fact, that the deceased was engaged in the habitual violation of the revenue laws of the United States. By violating the revenue laws the deceased did not forfeit his life. He was still under the protection of the law. The killing of him unnecessarily, wantonly and willfully, by a revenue officer, or any of his posse, would be as clearly murder as the killing of the most law-abiding citizen of the land.

It is not denied that the accused was lawfully on the spot, or that it was his duty to prevent the rescue or escape of the prisoners, but if, under the pretense of performing that duty, he fired on the deceased unnecessarily, wantonly and willfully, the law holds the act to be with malice; and if you find that such were the facts of this case, your verdict should be guilty. But if, on the other hand, the evidence satisfies you that the accused had reasonable cause to believe, and did believe at the time he fired the fatal shot, that in consequence of the hostile approach of the deceased he was placed in peril of life or limb, and by

reason of such supposed peril he fired upon the deceased, in that case it would be your duty to return a verdict of not guilty.

Under this charge the jury retired, and soon brought in a verdict of not guilty. The counsel for the prosecution then entered a nolle prosequi as to the defendants Wells and Newman.

NOTE [from original report in 5 Cent. Law J. 465]. No objection was made to the jurisdiction of the United States court in this case. A few days before, a motion had been made to remand to the state court a case of misdemeanor that had been transferred under the same section of the Revised Statutes, which, after full consideration, the court denied; and, as the opinion of the court on the right to remove cases of this kind was thus ascertained, it was probably deemed useless to make a similar motion in the present case.